**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DERRICK L. ALLEN,                                    :                    CASE NO. 1:12-CV-0731

           Plaintiff,                        :

v.                                                              :

COMMISSIONER OF SOCIAL SECURITY,      :          **MEMORANDUM DECISION**
                                                                              **AND ORDER**

           Defendant.                    :

Pursuant to 42 U. S. C. § 405(g), Plaintiff seeks judicial review of Defendant's final determination denying his claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act) and for Supplemental Security Income (SSI) under Title XVI of the Act.  Pending are the cross-Briefs of the Parties (Docket Nos. 21 & 22).  For the reasons that follow, the Magistrate affirms the Commissioner's decision.

## I. PROCEDURAL BACKGROUND.

On August 6, 2008, Plaintiff filed applications for DIB and SSI alleging that his disability began on September 10, 2007 (Docket No. 13, pp. 101-103; 108-114; 115-119 of 640).  Plaintiff's requests were denied initially and upon reconsideration (Docket No. 13, pp. 66-68, 69-71, 72-74, 75-77, 79-81, 85-87, 89-91 of 640).  Plaintiff filed a timely request for hearing and on July 22, 2010,

Administrative Law Judge (ALJ) Suzanne A. Littlefield held a hearing at which Plaintiff, represented by counsel, Vocational Expert (VE) Nancy Borgison, and Medical Expert (ME) Donald W. Jungless, all attended and testified (Docket No. 13, p. 27 of 640).  On September 10, 2010, ALJ Gattuso issued an unfavorable decision (Docket No. 13, pp. 13-20 of 640).  On December 15, 2011, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner (Docket No. 13, pp. 6-8 of 640).  Plaintiff filed a timely Complaint in this Court seeking judicial review.  Defendant filed an Answer.

## II.  FACTUAL BACKGROUND.

### A.  PLAINTIFF'S TESTIMONY.

Plaintiff, a 50-year old war veteran, was right-handed.  He occasionally drove to visit a relative or to go shopping.  Having been chronically depressed since September 10, 2007, Plaintiff claimed that the symptoms of severe depression, post-traumatic stress disorder (PTSD), paranoia, sleep paralysis, a knee injury and the inability to accept criticism, contributed collectively to his inability to work.  Fortunately his knee injury had healed to the extent that Plaintiff had regained sufficient strength and mobility to do some "slight" jogging and running (Docket No. 13, pp. 36-37; 44-45; 46 of 640).

While incarcerated, Plaintiff was enrolled at Cuyahoga Community College in a two-year program which upon completion, would have resulted in the award of a certificate.  However, after attending classes for thirty days, he withdrew because of his inability to focus and his fear that people were talking about him.  The grades achieved in the core-curriculum courses ranged from "C" to "D." Plaintiff attempted to return to school in June 2010 but he was unsuccessful, withdrawing this time after one week (Docket No. 13, pp. 40-41, 44, 47 of 640).

2

Plaintiff was a part-time employee at T.J.Maxx for a period of six months in 2009.  His duties included standing at a conveyor belt, opening boxes and sorting the contents of the boxes.  During his shift, he would lift twenty boxes that weighed up to 50 pounds each.  Feeling persecuted by his supervisor, Plaintiff quit the job (Docket No. 13, pp. 38-39 of 640).

In 2008, Plaintiff earned income for attending a training program sponsored by Goodwill Industries.  The training involved instructions on obtaining a job and coping with the demands of the job.  Plaintiff successfully completed the program (Docket No. 13, pp. 41, 42, 43 of 640).

Plaintiff was taking a medication that relieved the nightmares–Fluoxetine, an antidepressant and anti-obsessive-compulsive drug.  With the assistance of an outpatient counselor at the Veteran's Administration (VA), Plaintiff was a recovering substance abuser (Docket No. 13, pp. 50-51 of 640).

**B.**     **CONCLUSIONS OF THE ME.**

Averring that he was board certified in internal medicine and licensed in the State of Ohio, Dr. Jungless testified that he had reviewed the medical evidence in Plaintiff's file and that such evidence was sufficient for him to form an opinion as to Plaintiff's medical status (Docket No. 13, pp. 51, 52 of 640).

First, the ME listed Plaintiff's medically determinable impairments:

1.     Knee injury
2.     Hand injury
3.     PTSD
4.     Depression
5.     Paranoia
6.     Lack of social skills
7.     Diminished ability to utilize mathematics.

Second, acknowledging that he was familiar with the Commissioner's medical LISTING and based on his experience, education, training and review of the medical record, the ME opined that

3

under the "A" criterion of Listing 12.02[1], Plaintiff met the following criteria:

A.    Sleep disturbance;
B.    Feelings of guilt and worthlessness; and
C.    Thoughts of suicide.

Third, the ME opined that under the "B" criteria of 12.02[2]; Plaintiff had marked restrictions

of activities of daily living and marked difficulties in maintaining social function.  He stated that there

may have been some difficulties in maintaining concentration as well.  The ME was persuaded that

Plaintiff suffered from marked restrictions because he appeared very uncomfortable when surrounded

by people.  The ME pointed out that Plaintiff expressed feelings that people were targeting him for

a possible threat and the ME added that this is clear paranoid thinking.  Plaintiff reached the level of

severity to meet the listing in 2007 (Docket No. 13, pp. 51-53 of 640).

---

[1]

12.02 ***Organic mental disorders***:  Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.  The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.    Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
1.    Disorientation to time and place; or
2.    Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
3.    Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
4.    Change in personality; or
5.    Disturbance in mood; or
6.    Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
7.    Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., Luria-Nebraska, Halstead-Reitan, etc;

[2]

B.    Resulting in **at least** two of the following:

1.    Marked restriction of activities of daily living; or
2.    Marked difficulties in maintaining social functioning; or
3.    Marked difficulties in maintaining concentration, persistence, or pace; or
4.    Repeated episodes of decompensation, each of extended duration.

Fourth, the ME explained that Plaintiff's medical limitations resulted in the following functional limitations:

1.    Great difficulty with working in any area where he was exposed to people.
2.    Great difficulty working with people who were supervising him.
3.    Feelings of paranoia paralyzing his ability to be an effective employee.

Fifth, the ME opined that Plaintiff was not schizophrenic because he never had hallucinations or delusions.  Plaintiff had antisocial tendencies because of his paranoia.  The PSTD was more likely the result of his incarceration and childhood experiences (Docket No. 13, pp. 53-54 of 640).

Sixth, the ME opined that Plaintiff's use of alcohol may have worsened his anxiety.  The ME opined that drinking had no effect on Plaintiff's paranoia (Docket No. 13, p. 55 of 640).

**C.    CONCLUSIONS OF THE VE.**

The VE's categorization of Plaintiff's past work by physical demand, skill level and specific vocational preparation (SVP)[3] follows:

| JOB | PHYSICAL DEMAND | SKILL LEVEL | SVP |
|---|---|---|---|
| Commercial Cleaning | Performed at the **medium** level which involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C. F. R. §§ 404.1567(d); 416.967(d). | **Unskilled** work is work that needs little or no judgment to do simple duties that can be learned on the job in a short period of time. 20 C. F. R. §§ 404.1568(a), 416.968(a). | A level of 2 suggests that the worker needs anything beyond short demonstration up to and including 1 month.Www.onetonline.org/help/online/svp. |
| Laborer | Medium | Unskilled | **2** |

Assuming a person of Plaintiff's same age, education and experience, who had no exertional

---

[3]    SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information and develop the facility needed for average performance in a specific job-worker situation.  SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE REVISED DICTIONARY OF OCCUPATIONAL TITLES, APPENDIX B.  SPECIFIC VOCATIONAL PREPARATION (1993 Ed.)).

limitations with the exception of being able to kneel or squat for a short period of time but had limitations in terms of concentration, persistence and pace, was unable to deal with the general public on a regular basis and would need a job with limited interactions with supervisors and co-workers, the VE opined that this person could perform Plaintiff's past relevant work of cleaner provided such work was restricted to work in vacant apartments. Plaintiff could perform this work with little supervision and the job would not be in the public eye.

Finally, the ALJ asked the VE to consider a person of Plaintiff's same age, education and experience, who had no exertional limits with the exception of being able to kneel or squat for a short period of time but had limitations in terms of concentration, persistence and pace, was unable to deal with the general public on a regular basis and would need a job with limited interactions with supervisors and co-workers and in addition, this claimant would have "times of decomposition due to paranoia." The VE's response was that ideally the claimant would have fewer people around to witness these episodes; however, this claimant would have difficulty sustaining full-time work (Docket No. 13, pp. 57, 58 of 640)

### III. MEDICAL EVIDENCE.

The cornerstone for the determination of disability under both Title II and Title XVI is the medical evidence. Each person who files a disability claim is responsible for providing medical evidence from sources who have treated or evaluated the claimant, determined that the impairment exists and assessed the severity of that impairment. 20 C. F. R. §§ 404.1512((b), (c), 416.912(b), (c) (Thomson Reuters 2012). A chronological review of those sources who treated or evaluated Plaintiff follows.

### 1.    MEDICAL HISTORY SERVICES PROVIDED BY THE OHIO DEPARTMENT OF REHABILITATION

AND CORRECTIONS (ODRC).

A RELEASE MEDICAL SUMMARY dated August 24, 2005, provided a longitudinal view of Plaintiff's medical care provided during two separate terms of incarceration.  Notably, the reports confirm that Plaintiff has never been on the mental health caseload while incarcerated, that he had no history of suicide attempts or watches, that he was not receiving psychiatric treatment and there was no need to follow up with psychiatric treatment at the time of his release.  A summary of his significant encounters with medical personnel while housed with ODRC:

1.  December 30, 1981    Chest X-ray results were normal.
2.  July 3, 1985         Plaintiff was inoculated with the tetanus vaccine.
3.  April 7, 1986        Plaintiff obtained dental referral for toothache.
4.  June 2, 1986         Plaintiff was prescribed Tetracycline, an antibiotic.
5.  December 1986        Plaintiff underwent a streptococcus screen.
6.  August 13, 1987      A biopsy ordered based on abnormality in the amount of cells collected from oral mucosa.
7.  March 1989           Plaintiff was treated for worsening rash.
8.  In 1989              Plaintiff sustained a broken digit
9.  March 28, 1995       Plaintiff was treated for a small bruise on his arm, possibly from a bite.
10. April 3, 1995        The results from the blood chemistry tests were negative for glucose and ketones.
11. September 28, 1999   Plaintiff was treated for a rash on his face.
12. June 1, 2000         Plaintiff was treated for a discoloration to the scalp.
13. June 6, 2000         Plaintiff was prescribed Naproxen, a non-steroidal anti-inflammatory drug.
14. July 11, 2001        Alkaline phosphatase (any group of enzymes that liberate orthophosphate from phosphoric esters, with an optimum pH of above 7.0 (e.g., 8.6), present ubiquitously) levels and red blood count were lower than normal.
15. August 18, 2004      Results from the blood chemistry tests showed lower than normal bun/creatinine levels and elevated blood sugar and lymphocyte levels.
16. September 3, 2004    The echocardiogram was normal and there was no evidence of sinus bradycardia (slowness of the heartbeat).
17. August 8, 2005       The health screening release form reported that Plaintiff had a history of a stab wound in his left shoulder and a sexually transmitted disease.

(Docket No. 13, pp. 371-379, 386, 388, 389, 393, 395, 397, 399, 402, 405-406, 407, 410, 411, 419 of 640; PHYSICIAN'S DESK REFERENCE, 2006 WL 387492 (2006); STEDMAN'S MEDICAL

DICTIONARY 313400, 54300 (27th ed. 2000)).

2.    DR. DAVID V. HOUSE, PH. D., PSYCHOLOGIST.

An evaluation was conducted on August 29, 2005, during which Dr. House conducted a clinical interview and reviewed background information provided by the Bureau of Disability Determination (BDD).  Dr. House concluded that Plaintiff "would suffer from a diagnoses" of psychotic disorder, not otherwise specified (NOS), primarily revolving around disorganized thinking along with PTSD, adult antisocial behavior and polysubstance abuse in reported remission (Docket No. 13, p. 485 of 640).

Dr. House's five-part analysis that provides a comprehensive scope of factors which account for Plaintiff's mental health includes:

Axis I:     Psychotic disorder, not otherwise specified, primarily revolving around disorganized thinking; PSTD, adult antisocial behavior and polysubstance abuse in reported remission.
Axis II:    Personality disorder, not otherwise specified.
Axis III:   Deferred.
Axis IV:    Apparent psychotic process primarily in the form of paranoia with other thought disturbances, history of incarceration, PSTD features, and some historical substance abuse.
Axis V:     A global assessment of functioning score (GAF) or a comprehensive diagnosis that considers the complete picture of the entire scope of psychological, social and occupational functioning on a hypothetical continuum.  A score of 32 denotes some impairment in reality testing or communication (ex: speech is sometimes illogical, obscure, irrelevant) OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (ex: depressed man avoids friends, neglects family, and is unable to work).

(Docket No. 13, pp. 486-487 of 640).

3     DR. JENNIFER SWAIN, PH. D., A PSYCHOLOGIST.

Having completed the PSYCHIATRIC REVIEW TECHNIQUE and MENTAL FUNCTIONAL CAPACITY ASSESSMENT forms on October 17, 2005, Dr. Swain opined that Plaintiff had several medically determinable impairments that had characteristics of the LISTING but none which satisfied the "A"

diagnostic criteria of the LISTING:

1. A psychotic disorder, not otherwise specified        LISTING 12.03.
2. Anxiety as a predominant disturbance or anxiety experienced in the attempt to master symptoms.                        LISTING 12.03.
3. PSTD                                LISTING 12.06.
4. Inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning        LISTING 12.08.
5. Adult antisocial behavior; personality disorder, not otherwise specified
                                       LISTING 12.08.
6. Behavioral changes or physical changes associated with the regular use of substances that effect the central nervous system        LISTING 12.09.
7. Polysubstance abuser in reported remission        LISTING 12.09.

Under the "B" criteria of the LISTING, the degree of functional limitations that exist as a result

of these mental disorders was as follows:

1. Restriction of activities of daily living            Mild
2. Difficulties in maintaining social functioning        Moderate.
3. Difficulties in maintaining concentration, persistence or pace    Moderate.
4. Episodes of decompensation, each of extended duration    None.

There was no evidence in the record of the "C" criterion[4].

(Docket No. 13, pp. 421-431 of 640).

In the MENTAL FUNCTIONAL CAPACITY ASSESSMENT, Dr. Swain determined that Plaintiff did

---

[4]

12.02 C.  Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1). Repeated episodes of decompensation, each of extended duration; or (2). A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3). Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

12.04C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) Repeated episodes of decompensation, each of extended duration; or (2) A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

not have any marked limitations in understanding and memory, sustained concentration and

persistence, social interaction and adaptation.  Plaintiff did, however, have moderate limitations in the

following ability to:

1.  Understand and remember detailed instructions.
2.  Carry out detailed instructions.
3.  Maintain attention and concentration for extended periods.
4.  Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.
5.  Sustain an ordinary routine without special supervision.
6.  Work in coordination with or proximity to others without being distracted by them.
7.  Complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
8   Accept instructions and respond appropriately to criticism from supervisors.
9.  Respond appropriately to changes in the work setting.

Overall, Dr. Swain determined that Plaintiff could sustain at least simple, repetitive tasks in

a setting where duties were relatively static and not more than daily planning was required (Docket

No. 13, pp. 435-437 of 640).

**4.     DR. BRUCE GOLDSMITH, M. D.**

After reviewing all of the evidence in the file and Dr. Swain's assessments, Dr. Goldsmith

affirmed the PSYCHIATRIC REVIEW TECHNIQUE form and MENTAL RESIDUAL FUNCTIONAL CAPACITY

form as if rewritten (Docket No. 13, p. 442 of 640).

**5.     DR. WALTER BELAY, PH. D., A PSYCHOLOGIST.**

Dr. Belay performed an extensive psychological/vocational assessment, conducting clinical

interviews and testing on January 4, 2008, January 11, 2008 and January 28, 2008.  Overall, the results

from the tests placed Plaintiff's intellect within the low average to average range.  Plaintiff suffered

from a specific learning disorder withing the mathematics area.  The personality testing conducted in

the current evaluation confirmed that Plaintiff was depressed and the symptoms of distress were

superimposed on an underlying personality disorder with strong paranoid, passive aggressive and antisocial tendencies. Because of his incarceration, Plaintiff expressed concern about his ability to find and sustain employment. Dr. Belay administered three psychological tests: the Wechsler Abbreviated Scale of Intelligence (WAIS); the Wide Range Achievement Test (WRAT) and the Minnesota Multiphasic Personality Inventory-2 (MMPI). Plaintiff's results follow:

**A. THE WAIS.**

The WAIS, a nationally standardized test, is a quick, reliable measure of intelligence in clinical, educational and research settings. Www.pearsonassessments.com

Plaintiff's performance on this test revealed that his full scale intelligence quotient (IQ) was 85, which places him in the low average range of intellectual functioning. His verbal score was 89, which falls in the average range of intellectual functioning and his performance IQ was 84 which falls in the borderline range of intellectual functioning. Plaintiff's nonverbal reasoning capacity fell in the slow learner range.

**B. THE WRAT**

This test measures an individual's ability to read words, comprehend sentences, spell and compute solutions to math problems. Www.medical-dictionary.thefree dictionary.com/Wrat.

Here, Plaintiff was able to pronounce words out of context at the 12.5 grade level. Sentence comprehension fell at the 11.5 grade level and his spelling reflected a performance at the 12.7 grade level. His performance in math was at the 5.7 grade level. Dr. Belay attributed the lower math grade level to a possible specific learning disorder.

**C. MMPI-2.**

This is an empirically-based assessment of adult psychopathlogy used by clinicians to assist

in the diagnosis of mental disorders and the selection of appropriate treatment methods. Http://psychcorp.pearsonassessments.com.

As the results relate to Plaintiff, the clinical scales in this test described an individual who was experiencing a moderate level of emotional distress, characterized by brooding, dysphoria and anhedonia (absence of pleasure from the performance of acts that would ordinarily be pleasurable). The presence of dysphoria was permeated with anger, stubbornness and oppositional behavior. Plaintiff was uncomfortable dealing with people.

**D. CAREER ASSESSMENT INVENTORY-ENHANCED VERSION**.

Plaintiff's responses suggested a high interest in enterprising activities followed by a high interest in conventional areas, effective services, community services, educating, medical services, public speaking, law and politics, management and supervision and clerical/clerking activities. Plaintiff exhibited a very high interest in sales.

**E. DIAGNOSTIC IMPRESSION**.

Dr. Belay's five part analysis that provides a comprehensive scope of factors which account for Plaintiff's mental health includes:

Axis I:    Depressive disorder, not otherwise specified, with mixed depressive and anxiety features, and mathematics learning disorder.

Axis II:   Personality disorder, not otherwise specified, mixed type with antisocial paranoid and passive aggressive features.

Axis III:  Diagnosis deferred to medical evaluation

Axis IV:   Psychosocial stressors include problems with (1) primary support group; (2) occupations; (3) economics; and (4) the legal system.

Axis V:    A GAF of 60 which denotes the presence of moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers).

(Docket No. 13, pp. 449-453 of 640; STEDMAN'S MEDICAL DICTIONARY 23060 (27th ed. 2000)).

12

In the MEDICAL SUMMARY AND RECORDS completed on December 2, 2008, Dr. Belay affirmed the diagnoses of major depression and PTSD.  The prognosis was fair since the stressors that caused depression had been identified and Plaintiff was taking Prozac and undergoing counseling. (Docket No. 13, pp. 442-443 of 640).

6.      METROHEALTH MEDICAL CENTER.

Plaintiff presented with upper respiratory infection symptoms on March 28, 2008.  He was diagnosed and treated for bronchitis and reactive airways disease (Docket No. 13, pp. 462-463 of 640). Later on April 21, 2008, he was treated for acute bronchitis (Docket No. 13, pp. 464-466 of 640). Then on April 23, 2008, Plaintiff's chest was X-rayed.  The results showed mild emphysematous changes with peri-bronchial thickening.  Further pulmonary function data was needed for clinical correlation (Docket No. 13, p. 457 of 640).

Concerned that Plaintiff had a meniscal/cruciate tear, he was treated on July 29, 2008, for post-traumatic pain and swelling in the left knee.  The treatment plan included a magnetic resonance imaging (MRI) test (Docket No. 13, pp. 471-473 of 640).

On August 13, 2008, the results from the MRI of the left knee, showed a complex tear of the body of the lateral meniscus with a buckle handle component.  There was an edema pattern involving the entire lateral compartment (Docket No. 13, p. 458 of 640).

Electing surgery to repair the tear in the meniscus, Plaintiff underwent a left knee arthroscopy (endoscopic examination of the interior of a joint) and lateral meniscal debridement (excision of devitalized tissue and foreign matter from a wound) on September 24, 2008.  He tolerated the procedure well (Docket No. 13, pp. 474-475; 503-504 of 640; STEDMAN'S MEDICAL DICTIONARY 103350, 33500 (27th ed. 2000)).  In fact, one month after the surgery, Plaintiff presented with no pain.

13

He had resumed jogging and running without difficulty (Docket No. 13, pp. 492-493 of 640).

Diagnosed with depression on November 4, 2008, Plaintiff began a regimen including Fluoxetine and Trazodone (Docket No. 13, pp. 575-576 of 640).

Plaintiff was diagnosed with hypertension on November 25, 2008.  He was screened for malignant neoplasm in the prostate and further studies were conducted of his liver function (Docket No. 13, pp. 573-574 of 640).

Results from the ultrasound of Plaintiff's liver that was performed on December 24, 2009, were unremarkable.  There was evidence of gallbladder polyps (Docket No. 13, pp. 558-559 of 640).

On February 25, 2009, Plaintiff was "carjacked" and physically assaulted.  Although there were abrasions to the head and hand strain, results from the CT scan of Plaintiff's head, administered on February 26, 2009, showed no evidence of intracranial injury (Docket No. 13, pp. 555-557, 563-564, 567-569 of 640).

Plaintiff re-injured his hand on April 28, 2009.  The radiographic study showed no acute fracture so analgesics were prescribed in addition to elevation and rest.  In effect, Plaintiff's hand was normal (Docket No. 13, pp. 598-606 of 640).

7.    **DR. F. GREGORY NOVESKE, PSYCHIATRIST**.

Conducting a consultative examination on October 21, 2008, Dr. Noveske concurred that Plaintiff was depressed, that he did not have suicidal ruminations, anorexia or anxiety and he was irritable.  Plaintiff's cognitive and intellectual limitations included poor concentration and a negative effect on his ability to feel pleasure.  Plaintiff interacted with others poorly, having been abused by his father.  His ability to tolerate stress was poor (Docket No. 13, pp. 492-496 of 640).

On November 11, 2008, Dr. Noveske saw Plaintiff and completed MEDICAL STATUS

14

QUESTIONNAIRE.  Diagnosing Plaintiff with a major depressive disorder and PTSD, he determined that Plaintiff was calmer with Prozac and sleeping well with Trazodone.  There was no evidence of suicidal or homicidal ruminations.  Overall, Dr. Noveske noted that Plaintiff's ability to sustain concentration was poor and that he had very poor deficiencies in social interaction and adaptation (Docket No. 13, pp. 539-540, 590-591 of 640).

On December 16, 2008, Plaintiff was feeling calmer with the Prozac and he was sleeping better with the Trazodone (Docket No. 13, p. 589 of 640).

On February 17, 2009, Dr. Noveske noted that Plaintiff had been off Prozac for a month due to paperwork snafu at MetroHealth.  He was restarted on Prozac and Trazodone (Docket No. 13, pp. 587-588 of 640).

Plaintiff admitted that he was not taking Prozac but overall his mood was better.  On May 19, 2009, Dr. Noveske closed out his care because Plaintiff was no longer taking psychotropic medications (Docket No. 13, p. 607 of 640).

On June 23, 2009, Dr. Noveske stated that overall, Plaintiff had a fair ability to make occupational adjustments and he had fair to poor abilities in maintaining regular attendance and being punctual within customary tolerances, dealing with the public, relating to co-workday, interacting with supervisors and functioning independently without special supervision (Docket No. 13, pp. 608-610 of 640).

8.    **DR. KAREN STEIGER, PH. D., A CLINICAL PSYCHOLOGIST.**

The MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT and PSYCHIATRIC REVIEW TECHNIQUE forms were completed on November 25, 2008.  Dr. Steiger made a detailed explanation of

15

Plaintiff's moderate degree of limitation in the following categories:

1. Ability to remember locations and work-like procedures.
2. Understand and remember detailed instructions.
3. Carry out detailed instructions.
4. Maintain attention and concentration for extended periods;
5. Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;
6. Sustain an ordinary routine without special supervision;
7. Work in coordination with or proximity to others without being distracted by them;
8. Complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods
9. Interact appropriately with the general public.
10. Ask simple questions or request assistance.
11. Accept instructions and respond appropriately to criticism from supervisors.
12. Get along with co-workers or peers without distracting them or exhibiting behavioral extremes.
13. Respond appropriately to changes in the work setting.
14. Set realistic goals or make plans independently of others.

(Docket No. 13, pp. 517-519 of 640).

Dr. Steiger's medical opinion included the following medically determinable impairments that were present but which did not precisely satisfy the diagnostic criteria of the Listing.  The "A" criterion includes:

1. Psychotic disorder, not otherwise specified     LISTING 12.03.
2. Major depressive disorder                        LISTING 12.04
3. PSTD                                             LISTING 12.06.
4. Adult Antisocial Behavior                        LISTING 12.08.
5. Polysubstance abuse in reported remission        LISTING 12.09.

Under the "B" criteria of the Listing, the degree of functional limitations that exist as a result of these mental disorders was as follows:

1. Restriction of activities of daily living                          Mild
2. Difficulties in maintaining social functioning                    Moderate
3. Difficulties in maintaining concentration, persistence or pace    Moderate
4. Episodes of decompensation, each of extended duration             None

16

(Docket No. 13, pp. 517-533 of 640).

Dr. Suzanne Castro, Psy. D., affirmed this assessment on March 24, 2009, pointing out that Plaintiff was recently feeling better and when he reported that he was frustrated, he had not been taking his medication (Docket No. 13, p. 597 of 640).

**9.      CATHOLIC CHARITIES SERVICES.**

Plaintiff stopped taking his medication and his symptoms increased after Plaintiff was diagnosed with major depression and PTSD.  A plan was developed by clinician Alex Berenson on February 12, 2009, to assist Plaintiff with managing his emotions under stress in the outside world, reduce symptomology and develop a global perspective to managing his stressors (Docket No. 13, pp. 592-596 of 640).

Despite being angered and agitated, Plaintiff was making some progress.  Alex Berenson noted that during the entire session on June 2, 2009, Plaintiff unconsciously redirected his feelings onto Mr. Berenson (Docket No. 13, pp. 610-611 of 640).

Plaintiff was discharged on December 14, 2009, when he did not return for services.  There is some indication that during the time he underwent treatment from June 26, 2008 through June 26, 2009, Plaintiff accomplished some of his goals (Docket No. 13, pp. 638-640 of 640).

**10.     BUREAU OF DISABILITY DETERMINATION'S DAILY ACTIVITIES QUESTIONNAIRE.**

A licensed social worker completed this form on February 24, 2009 and described how Plaintiff was compatible with his family members but there was tension reported when dealing with authority figures.  Plaintiff was capable of preparing his food and performing household chores.  He was independently capable of taking care of his personal hygiene and shopping.  Plaintiff was undergoing supportive counseling and he was taking medication (Docket No. 13, pp. 550-551 of 640).

11.     VETERANS AFFAIRS.

Plaintiff presented on December 8, 2009, with symptoms of depression, anxiety and PTSD.  His car had been repossessed, his rent was in arrears and his telephone had been disconnected.  The VE intervened with Plaintiff's medication management and continued his medications.  An evaluator apportioned a GAF score that denoted the presence of serious symptoms (ex: suicidal ideation, severe obsessive rituals) OR any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job). (Docket No. 13, pp. 612-616 of 640).

Although Plaintiff's blood pressure was normal without medication when measured on December 14, 2009, he was reeducated about taking his medication.  A colorectal cancer screening was recommended and he was referred to the mental health unit.  The toxicology screen was positive for Hepatitis C as well as cocaine (Docket No. 13, pp. 617-620 of 640).

Diagnosed with a history of PSTD, a major depressive disorder, recurrent, borderline personality disorder vs. antisocial personality disorder and moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers), Plaintiff underwent medication reconciliation and education on March 18, 2010, April 15, 2010 and May 13, 2010.  There was a notation to ascertain whether Plaintiff had an ethanol dependence versus abuse (Docket No. 13, pp. 625-636 of 640).

IV.  STEPS TO SHOWING ENTITLEMENT TO SOCIAL SECURITY BENEFITS.

DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); See also 20 C.F.R. § 416.920)).  "Disability"

18

is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).  The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively.  To assist clarity, the remainder of this decision refers only to the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that he or she is not currently engaged in "substantial gainful activity" at the time her or she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6ᵗʰ Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.*  A "severe impairment" is one which "significantly limits the claimant's physical or mental ability to do basic work activities. *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6ᵗʰ Cir. 2001)

19

(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive

finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. §

404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## V. THE ALJ'S FINDINGS.

Upon consideration of the evidence, the ALJ made the following findings[5]:

1.  Plaintiff had not engaged in substantial gainful activity since August 6, 2008, the
    application date.

2.  Plaintiff had the following severe impairments:  affective disorders of depression, anxiety,
    PTSD, substance abuse claimed to be in remission and status post left knee repair.

3.  Plaintiff did  not have an impairment or combination of impairments that meets of
    medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P,
    Appendix 1.

4.  Plaintiff had the residual functional capacity to perform medium work as defined in 20 C.
    F. R. § 404.1567(b) and 416.967(c), except that Plaintiff was limited to kneeling only
    occasionally for short periods of time and would need limited interaction with the public,
    co-workers and supervisors.

5.  Plaintiff was capable of performing his past relevant work in housing maintenance and
    cleaning and warehouse work.  This work did not require the performance of work-related
    activities precluded by Plaintiff's residual functional capacity.  .

6.  Plaintiff had not been under a disability as defined in the Act since August 6, 2008, the date
    the application was filed

(Docket No. 13, pp. 13-20 of 640).

## VI.  STANDARD OF REVIEW.

Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final

decision of the Commissioner.  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-

---

[5]

     The ALJ's decision addresses only the application for SSI (Docket No. 132, pp. 13, 20 of 640).  Reference to SSI
only does not affect the outcome of the ALJ's decision or this Court's review since the standards for establishing DIB and
SSI are the same.

833 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

21

## VII. DISCUSSION.

Plaintiff argues that:

1. The ALJ committed legal error in the evaluation of Plaintiff's residual functional capacity by substituting her own, non-medical opinion for that of treating and examining psychiatrists and the ME.
2. The ALJ's evaluation of the medical evidence is not supported by substantial evidence, nor properly conducted, in light of her rejection of the ME's testimony.
3. The ALJ's evaluation of the medical evidence is not supported by substantial evidence nor properly conducted because of the failure to evaluate the opinion of Plaintiff's treating psychiatrist.
4. The ALJ erred by failing to perform the appropriate drug and alcohol materiality analysis.

Defendant responded:

1. There is substantial evidence supporting the weight given the medical source opinions.
2. There is substantial evidence supporting the ALJ's finding that a significant number of jobs accommodate Plaintiff's functional capacity and vocational profile.

**1.    RESIDUAL FUNCTIONAL CAPACITY.**

Plaintiff argues that the ALJ's residual functional capacity fails to consider that he had paranoid thinking.  Because of this omission, Plaintiff contends that the ALJ's residual functional capacity is not supported by substantial evidence.

### a.    THE RESIDUAL FUNCTIONAL CAPACITY STANDARD OF REVIEW.

Residual functional capacity is an assessment of one's remaining capacity for work once his or limitations have been taken into account.  *Webb v. Commissioner of Social Security*, 368 F.3d 629, 632 (6th Cir. 2004) (*citing* 20 C. F. R. § 416.945).  It is an assessment of what a claimant can and cannot do, not what he or she does and does not suffer from.  *Id.*  Under those regulations, the ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an "assessment of [her] residual functional capacity."  *Id.* (*citing* 20 C.F.R. § 416.920(a)(4)(iv)).  The VE testifies on the basis of a claimant's "residual functional capacity and  . . .  age, education, and work

experience" and assesses whether the claimant "can make an adjustment to other work." *Id.* (*citing* 20 C.F.R. § 416.920(a)(4)(v)).

     **b.  THE ALJ'S RESIDUAL FUNCTIONAL CAPACITY FINDING.**

     Declining to explicitly include Plaintiff's paranoia as a severe impairment was harmless error because it does not appear that Plaintiff was ever diagnosed with psychoses.  The ALJ did find that Plaintiff had severe impairments of depression, anxiety, PTSD and poly-substance abuse.  Such findings were advanced in the sequential evaluation and ultimately in determining residual functional capacity.  It is not error for the ALJ to make a determination regarding the Plaintiff's psychological impairments where the ALJ made a residual functional capacity finding restricted to work involving limited interaction with the public, co-workers and supervisors.

     **2.  THE OPINIONS OF THE ME.**

     Plaintiff argues that the ALJ erred by failing to develop the record through ME testimony that his impairment meets 12.04 of the LISTING.

     **a.  THE STANDARD FOR REVIEWING MEDICAL EXPERT TESTIMONY.**

     The primary function of a ME is to explain medical terms and the findings in medical reports in more complex cases in terms that the administrative law judge who is not a medical professional, may understand.  *Richardson v. Perales*, 91 S.Ct. 1420, 1420 (1972).  The Commissioner's regulations provide that an ALJ may ask for and consider opinions from MEs on the nature and severity of the claimant's impairment and on whether the impairments meet or equal impairments in the LISTING.  20 C.F.R. § 404.1527(f)(2)(iii) (Thomson Reuters 2012).  An ALJ's decision whether a medical expert is necessary is inherently discretionary and the primary reason an ALJ may obtain ME opinion is to gain information which will help him or her evaluate the medical evidence in a case, and determine

whether the claimant is disabled.  20 C. F. R. § 404.1527(f)(2)(iii) (Thomson Reuters 2012).

Social Security Ruling (SSR) 96–6p, POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, 1996 WL 374180, *1 (July 2, 1996), requires an ALJ to obtain ME testimony on the issue of medical equivalence when, in the ALJ's opinion, "the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable."  SSR 96–6P, 1996 WL 374180, at *4.

**b.  THE ALJ'S TREATMENT OF THE ME.**

The Magistrate finds that it was entirely up to the ALJ to call an expert witness in the course of the administrative hearing to determine whether Plaintiff's impairment or impairments were medically equivalent to a listed impairment.  While some listings include strictly medical criteria, many have criteria which include symptoms and functional limitations.  Listings 12.02 and 12.04 include symptoms and functional limitations more appropriately coming from a treating or examining source. The ALJ found that there were some questions as to whether Plaintiff's impairments were at least equal in severity and duration of 12.02 of the listed impairment and the combined effect and impact of the full array of Plaintiff's impairments to other sections of the LISTING.  The ME's testimony was helpful in offering an opinion on the symptoms that could be related to the diagnosed impairment, therefore determining whether step three of the sequential evaluation was case dispositive.

However, it must be kept in mind that the ME's testimony is merely an opinion that the ALJ can discount to the extent that it is in conflict with some of the issues reserved to the Commissioner. Whether an impairment meets or equals the listing is not a medical issue but an administrative finding

that can direct the determination or decision of disability.  Its determination is reserved for the Commissioner.  Similarly, residual functional capacity is an administrative finding based on all of the relevant medical and other evidence.  A determination of residual functional capacity is an administrative finding reserved for the Commissioner, not the ME.

The decision of the ALJ alone to ultimately identify the characteristics of Plaintiff's residual functional capacity or to determine whether Plaintiff's impairments did not meet step three of the sequential evaluation, is consistent with the rules.  There is no basis upon which to disturb this finding.

**3.**     **THE TREATING PHYSICIAN**

Plaintiff reminds the Court that Dr. Noveske treated him from October 2008 through May 2009 and he completed a questionnaire that Plaintiff had poor concentration and social interaction.  In arguing that the ALJ erred in failing to evaluate the opinion of treating physician Dr. Noveske, Plaintiff is in essence contending that the ALJ was required to give Dr. Noveske's opinions controlling weight or alternately, that the ALJ erred in disregarding all of his medical evidence.

**a.**  **THE TREATING SOURCE STANDARD.**

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. §§ 404.1527(d), 416.927(d) (Thomson Reuters 2013).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of the claimant's impairment(s), including symptoms, diagnosis and prognosis, what the claimant can still do despite impairment(s), and the claimant's physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)(Thomson Reuters 2012).  Some opinions, such as those from examining and treating physicians, are normally entitled to greater weight.  20 C.F.R. §§ 404.1527(d), 416.927(d)(Thomson Reuters 2013).

25

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Smith v. Commissioner of Social Security*, 482 F.3d 873, 875 (6ᵗʰ Cir. 2007) (*citing* 20 C.F.R. § 404.1502). A physician seen infrequently can be a treating source "if the nature and frequency of the treatment or evaluation is typical for [the] condition." *Id.*

The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances. *Cross v. Commissioner of Social Security*, 373 F. Supp.2d 724, 729-730 (N.D.Ohio 2005). More weight is attributed to treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). If such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. *Id.* (*citing* 20 C. F. R. § 404. 1527(d)(2)).

**b**. **DR. NOVESKE'S OPINIONS**.

In this case, the ALJ did not address or even suggest that she considered the findings of Dr. Noveske. After review, the Magistrate finds that Dr. Noveske is a treating source but that his opinions are not entitled to controlling weight. Such a finding is consistent with the rules.

Dr. Noveske did not see or treat Plaintiff with enough frequency that he could provide a

longitudinal picture of Plaintiff's impairment, including symptoms, diagnosis and prognosis.  Along with clinician Alex Berenson, Dr. Noveske provided pharmacological management services.  His treatment notes show that the completion of several medical summaries but no clinical or diagnostic techniques that assist in making a case for the cognitive and intellectual limitations that Plaintiff prescribed.  On October 21, 2008, Dr. Noveske completed a form for BDD on which he gave a comprehensive opinion which concluded that Plaintiff had anhedonia and had poor concentration skills (Docket No. 13, pp. 493-496 of 640).  On November 11, 2008, Dr. Noveske saw Plaintiff and completed MEDICAL STATUS QUESTIONNAIRE.  Adopting the diagnoses that Plaintiff had a major depressive disorder and PTSD, Dr. Noveske accepted Plaintiff's representation that he was calmer and that he slept well with Trazodone.  He also noted that Plaintiff's ability to sustain concentration was poor and that he had very poor deficiencies in social interaction and adaptation (Docket No. 13, pp. 539-540, 590-591 of 640).  Again, on December 16, 2008, Dr. Noveske reported that Plaintiff was feeling calmer with the Prozac and he was sleeping better with the Trazodone because Plaintiff told him so (Docket No. 13, p. 589 of 640).  On February 17, 2009, Dr. Noveske noted that Plaintiff had been off Prozac for a month without incident so he restarted Plaintiff on Prozac and Trazodone (Docket No. 13, pp. 587-588 of 640).  On May 19, 2009, Plaintiff admitted that he was not taking Prozac but overall his mood was better (Docket No. 13, p. 607 of 640).

Considering his treatment record, Dr. Noveske monitored Plaintiff's consumption of Prozac and Trazodone which was correlated to his reaction to life stressors.  The medical records and treatment notes do little to provide support for the diagnostic or clinical nature of Dr. Noveske's judgments about the nature and severity of the Plaintiff's impairment.  The ALJ could not adopt Dr. Noveske's observations and conclusions or give them controlling weight because neither fully satisfied the social

27

security regulations.

The Magistrate acknowledges that the ALJ must consider all of the evidence and she can consider all of the evidence without directly addressing in the written decision every piece of evidence submitted by the party.  Except for the ALJ's assertion that she considered the entire record, there are no clear indicators that she specifically considered Dr. Noveske's opinions and attributed much weight to them.  Nevertheless, the ALJ's failure to conduct a lengthy examination of Dr. Noveske's opinions is harmless error.  Stated differently, in these proceedings, the failure to consider Dr. Noveske's opinions and give them controlling weight did not have a substantial and injurious effect or influence in determining the ALJ's decision to deny the benefits.

4.    DRUG AND ALCOHOL ANALYSIS.

Plaintiff alleges that although the ALJ determined that he suffers from substance abuse allegedly in remission, there were reports of several failed toxicological analyses that showed Plaintiff was not entirely alcohol and drug free.  In fact, the ALJ expressed her suspicions that Plaintiff was still drinking and/or using drugs.  Nevertheless, the ALJ failed to consider whether his drinking and/or drug usage were material to his mental impairments and ultimately his disability.

1.    THE REGULATORY FRAMEWORK FOR DRUG ADDICTION AND ALCOHOLISM.

In the Contract with America Act of 1996 ("Welfare Reform Act"), Pub.L.No. 104–121, 110 Stat. 847, 852–53 (1996), codified at 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J), Congress amended the Act to prohibit the award of benefits to individuals for whom alcoholism or drug addiction is a contributing factor material to their disability determination.  *Mathews v. Astrue*, 2011 WL 7145221, *7 (N.D.Ohio,2011), *adopted by* 2012 WL 369214 (N.D.Ohio, 2012) (*citing* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).  The statute provides, in relevant part:

An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.

*Id.* (*citing* 42 U.S.C. §§ 423(d)(2)(C)).

The Commissioner promulgated regulations which control in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability.  20 C.F.R. §§ 404.1535, 416.935).  Those regulations provide:

(a)  General.  If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(b)  Process we will follow when we have medical evidence of your drug addiction or alcoholism.

(1)  The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2)  In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(i)  If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii)  If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism, and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

Under the statutes and implementing regulations if a claimant is disabled and there is medical evidence of substance abuse, the Commissioner must determine whether the drug addiction or alcoholism is a contributing factor material to the determination of disability.  *Mathews, supra*, at *7. If it is, the claimant will be found not to be "disabled" as defined in the Act.  *Id.*  A finding of disability

29

is a condition precedent to the determination of whether drug addiction or alcoholism is a contributing factor material to the disability determination.  *Id.* (*citing* 20 C.F.R. § 416.935).  Therefore, in a case where drug addiction or alcoholism is suggested by the evidence, the ALJ must first apply the five-step sequential evaluation process to determine whether a plaintiff's limitations, including consideration of drug addiction or alcoholism, are disabling.  *Id.*  If so, the ALJ must then assess plaintiff's residual functional capacity limitations which would remain if he or she stopped using drugs or alcohol, and apply the sequential evaluation process a second time to determine whether the limitations assessed would be disabling.  *Id*.

The claimant has the burden of proving that substance abuse is not a factor material to the determination of disability.  *Davenport v. Commissioner of Social Security*, 2012 WL 414821, *10 (E.D.Mich.,2012) (*citing Trent v. Astrue*, 2011 WL 841538, *8 (N.D.Ohio,2011), *Estes v. Barnhart*, 275 F. 3d 722, 725 (8th Cir. 2002); *Brown v. Apfel*, 192 F. 3d 492, 498 (5th Cir. 1999)).

**B.  THE ALJ'S DECISION.**

The Commissioner's promulgated regulations which control the determination of whether drug addiction or alcoholism are contributing factors material to the determination of disability require that the ALJ must first apply the five-step sequential evaluation process to determine if the claimant is disabled.  A finding of disability **and** medical evidence of drug addiction or alcoholism are conditions precedent to the determination of disability under the Act.  Simply, since Plaintiff was not considered disabled as defined under the Act, the ALJ was not required to conduct a determination of whether Plaintiff's apparent use of drugs had any effect on his disability.

**VIII.  CONCLUSION**

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

30

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date:   March 6. 2013